IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| WILLIAM TAYLOR | : | CIVIL ACTION |
| --- | --- | --- |
| Plaintiff, | : | NO. 11-4479 |
| v. | : | |
| JOHNSON & JOHNSON, | : | |
| Defendant. | : | |

## MEMORANDUM

**Jones, II, J.**  February 11th, 2013

William Taylor brings this non-jury action against his former employer, Johnson & Johnson ("J&J"), pursuant to Sections 502(a)(1)(B) and 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B), 1140, challenging the decision to terminate his long term disability benefits. Presently before the Court is J&J's Motion for Summary Judgment ("Def. Mot."), including its Statement of Undisputed Material Facts ("Def. SUF") (collectively, Dkt. No. 11), as well as Plaintiff's cross-motion for summary judgment[1] ("Pl. Mot.") (Dkt. No. 12), and Defendants' Reply (Dkt. No. 13). Having thoroughly examined the administrative record, for the reasons set forth below Defendant's Motion will be GRANTED and Plaintiff's Motion will be DENIED.

## I. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[1] Plaintiff has not filed a Counter Statement of Undisputed Facts, nor has he filed a response challenging the content of J&J's Statement.

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. An issue is genuine if the fact finder could reasonably return a verdict in favor of the nonmoving party with respect to that issue. *Anderson*, 477 U.S. at 249. In reviewing a motion for summary judgment, the court does not make credibility determinations and "must view facts and inferences in the light most favorable to the party opposing the motion." *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

**II.    FACTS**

Plaintiff Taylor was employed by J&J's wholly-owned subsidiary Noramco, Inc. ("Noramco") as a Chemical Operator II, and thus was eligible to participate in J&J's Long Term Disability Income Plan for Choices Eligible Employees of Johnson & Johnson and Affiliated Companies ("the Plan"). (Def. SUF at ¶¶ 1-2.) The Pension Committee of Johnson & Johnson ("JJPC") is the named fiduciary of the Plan, which the Plan states "shall control and manage the operation and administration of the Plan." (*Id.* ¶ 8.) The Plan states that the "named fiduciary may exercise discretion in making determinations of fact, interpreting the terms of the Plan, adopting rules and taking other actions with respect to which it has authority. Any interpretation

2

or determination made pursuant to such discretionary authority shall be conclusive and given full force and effect, subject to any right to appeal the interpretation or determination . . . ." (*Id.* ¶ 9.) The powers over which JJPC has "sole authority" include sole authority to "[e]xercise its discretion to determine eligibility for benefits," "[d]elegate its authority established hereunder," and "[e]xercise final authority and responsibility for administration and operation of the Plan, including without limitation adjudication of all claims and claims appeals." (*Id.* ¶ 11.)

During the relevant time period, the Plan defined the term "Total Disability" or "Totally Disabled" to mean, during the initial 26 week period of claimed disability, "the complete inability of the Participant, due to Sickness or Injury, to perform the material and substantial duties of the Participant's regular job, with or without reasonable accommodation . . . ." Thereafter, for a period not exceeding 24 months, the definition required "the complete inability of the Participant, due to Sickness or Injury, to perform the Essential Functions of his or her Regular Occupation or of a Reasonable Employment Option available to the participant, and as a result the inability to earn more than 60% of pre-disability Regular Monthly Earnings with or without reasonable accommodation." After the 24 month period, the definition required "the complete inability of the Participant, due to Sickness or Injury, to perform the Essential Functions of any Gainful Occupation that his or her training, education and experience would allow the Participant to perform, or for which the Participant may reasonably become qualified, with or without reasonable accommodation." (*Id.* ¶¶ 12-13.) Taylor began his period of disability on October 2, 2001, after he was diagnosed with Major Depression with Agitation and knee problems. Kemper National Services, which was the Claim Service Organization ("CSO") for the Plan, approved Taylor's claim for LTD benefits on April 2, 2002. (*Id.* ¶¶ 14-15.)

Taylor passed the 24 month mark of LTD benefits and became subject to the more limited definition of Total Disability as of April 2004, and was asked to complete medical forms to determine his continued eligibility. (*Id.* ¶ 18.) By letter dated July 26, 2004, the new Plan CSO Broadspire Services, Inc. ("Broadspire") notified Taylor that he continued to meet the definition of Total Disability. (*Id.* ¶ 19.) In March 2005, after receiving a report from Taylor's treating psychologist, Beatrice Lazaroff, Ph.D., Broadspire's Lawrence Burstein, Ph.D. conducted a "Peer to Peer Physician Review with Dr. Lazaroff. Based on a review of the record and conversations with Dr. Lazaroff, Burstein concluded that Taylor's anger management issues were "circumscribed to his particular job" with Noramco, that nothing Dr. Lazaroff described indicated his symptoms would preclude working an 8-hour day, and thus "it cannot be substantiated that the claimant is unable to work an 8-hour day in a sedentary job." (*Id.* ¶ 21; AR 631.) Thereafter, Broadspire arranged for an independent medical examination ("IME") of Taylor, which was conducted on April 8, 2005 by Marc Kossmann, Ph.D. (Def. SUF ¶ 22.) In a report dated April 21, 2005, Kossmann concluded, based upon a four-hour examination and the administering of various tests, that although Taylor's anger management issues might pose a threat to coworkers, with proper supports he was "capable of working an eight hour day with the understanding that he does have significant anger management issues." (*Id.* ¶ 23; AR 600.) Thereafter, Broadspire asked Elana Mendelssohn, Ph.D. to conduct another Peer Review. She opined: "Overall I am in agreement with the submitted IME [of Dr. Kossmann] in that the claimant is capable of working an 8-hour day." She disagreed with Kossmann's statement that Taylor might pose a threat to coworkers, finding that his anger management issues were limited to his last job. (Def. SUF ¶ 25; AR 603.) Based on these medical opinions, Broadspire informed

Taylor on June 9, 2005, that he no longer met the Plan's definition of total disability and that his benefits would terminate as of August 8, 2005. (Def. SUF ¶ 26.)

Taylor filed an administrative appeal of this decision on December 7, 2005, enclosing documents from Dr. Lazaroff dated November 11, 2005, as well as a letter from his primary care physician advising that Taylor was scheduled to undergo complete knee replacement in the near future. (*Id.* ¶ 28; AR 559.) On February 22, 2006, Broadspire reinstated his LTD benefits retroactive to August 8, 2005. (Def. SUF ¶ 30.) Taylor underwent left knee replacement surgery on December 13, 2005 and right knee replacement surgery on December 5, 2006. (*Id.* ¶¶ 31, 34; AR 36, 45-46.)

By 2006, Reed Group ("Reed") became the Plan's CSO. (Def. SUF ¶ 32.) Reed requested medical documentation on October 24, 2006 and February 12, 2007. (*Id.* ¶¶ 32, 35.) Dr. Ronald Rosenfeld submitted an Attending Physician Statement on February 15, 2007, opining that Taylor was "not able to work" and "totally disabled." Rosenfeld opined that Taylor could "never" return to work. (*Id.* ¶ 36; AR 103.) On February 19, 2007, Reed obtained documents from Premier Orthopaedic & Sports Medicine ("Premier"), to whom Rosenfeld had referred Taylor for physical therapy. Those documents noted that Taylor had less pain and greater mobility, and there was objective improvement. (Def. SUF ¶ 38; AR 117.)[2] Progress notes from Dr. Rosenfeld on January 14, 2007 noted that Taylor was "one month post-op right total knee replacement, doing much better. Pain levels have come off nicely." (Def. SUF ¶ 39; AR 123.) A note from March 1, 2007 noted "excellent progress" with his right knee with no

---

[2] While J&J asserts that Taylor told his therapist that he had moved a large piece of furniture up steps, and had shoveled snow, these are mischaracterizations of the treatment notes. Taylor told his therapist that his left leg "gave out" while he attempted to move a piece of furniture (AR 115) and he experienced "discomfort" while attempting to shovel snow. (AR 108.)

5

pain, and "intermittent discomfort" in the left knee. He opined that one more month of physical therapy "should do the trick for him." (Def. SUF ¶ 40; AR 179.)

At Reed's request, Taylor underwent a Functional Capacity Evaluation ("FCE") in March 2007, conducted by Shawn Vogel, MPT. (Def. SUF ¶¶ 41-43.) Vogel reported that Taylor satisfied the ability to perform all tasks required of a sedentary occupation, as defined by the United States Department of Labor Physical Demand Level for sedentary work, with restrictions on floor to waist lifting, crouching, and kneeling, and opined that Taylor could expect continuing improvement in his ability to perform floor to waist lifting. (*Id.* ¶ 44; AR 194.) Based upon this report, Reed notified Taylor on April 11, 2007, that his LTD benefits based on his bilateral knee condition would terminate on May 11, 2007. (AR 191.) That same notice informed Taylor that his LTD benefits based on his mental health condition would continue, but noted that its records showed that Taylor had not been under the care of any treating professional for his mental health condition, and thus was not meeting the terms of the Plan. (AR 192.) He was given thirty days to comply with the treatment requirement by commencing treatment with a mental health professional and providing written documentation of compliance. (AR 193.) However, before the thirty day period lapsed, by letter of April 20, 2007, Reed notified Taylor that "[a]t this time, we are **terminating your LTD benefits effective May 11, 2007** in relation to both the mental health and physically disabling conditions. . . ."[3] (AR 197-99 (emphasis in original).)

On October 3, 2007, Taylor filed an administrative appeal of the decision to terminate his benefits, enclosing a report from Taylor's treating orthopedist Dr. Rosenfeld dated May 23, 2007. (*Id.* ¶ 54; AR 203.) J&J asserts that this letter served only to appeal the termination of

---

[3] This Court notes that, notwithstanding Reed's failure to accord Taylor the full thirty day period to provide proof that he was under the care of a treating professional for his mental health condition, Taylor has come forward with no evidence to meet his summary judgment burden under *Celotex*, 477 U.S. at 322, of showing that he was under such care at that time, to show that J&J's ultimate decision on his mental health benefits was arbitrary or unreasonable.

6

LTD benefits based upon Taylor's knee condition since it referenced only Dr. Rosenfeld's opinions, and that there is nothing in the Administrative Record showing that Taylor ever appealed the termination of his benefits based upon his mental health condition. (Def. SUF ¶ 56.) In response to J&J's argument, Taylor has come forward with no citation to the Administrative Record to show that he ever appealed the termination based upon his mental health condition.

Dr. Rosenfeld opined that Taylor "remains totally disabled from returning to his previous occupation. . . . Even over the long term, I do not expect that he ever will be able to return to his previous activity level or perform any other occupation that requires a significant amount of standing, walking, climbing, bending or heavy lifting. I consider these restrictions to be permanent." (*Id.* ¶ 55; AR 204.) As part of the appeal, Reed engaged GENEX Services to arrange an IME. (Def. SUF ¶ 61.) GENEX engaged orthopedic surgeon Dr. John Duda, and provided him with the Plan's definitions of disability. (*Id.* ¶ 62.) Duda examined Taylor on December 12, 2007. In his subsequent report, Dr. Duda opined that Taylor "is employable on a full time basis in a limited capacity." (*Id.* ¶ 64; AR 238-39.) Reed also arranged for Taylor to undergo a Transferrable Skills Analysis ("TSA"), which was conducted by a GENEX case manager, Steven Weinberg, MS, CRC. (Def. SUF ¶ 65.) Weinberg opined that, based upon his medical status, education and prior work history, Taylor was capable of performing sedentary work such as a gate guard, a telephone solicitor, an assembler, a surveillance system monitor, a hotel desk clerk, or a file clerk. (AR 247-51.) On February 11, 2008, Reed denied Taylor's first administrative appeal and Taylor exercised his second level of administrative appeal. (Def. SUF at ¶ 67.)

As part of the second level of appeal, Taylor submitted another report from Dr. Rosenfeld, dated February 28, 2008, in which Rosenfeld disputed Dr. Duda's opinion that Taylor could frequently stand, sit without limitation, and climb on an occasional basis. Rosenfeld opined that Taylor could stand only on an occasional basis, sit only on a frequent basis with the ability to get up and change positions on an as needed basis, could climb stairs occasionally, but never climb ladders. (*Id.* ¶ 69; AR 259.) J&J's Corporate Benefits Department, the Plan's designated arbiter at the second appeal level, requested another independent peer review, which was conducted by orthopedic surgeon Dr. Vaughan Frigon. (Def. SUF ¶¶ 71-73.) Dr. Frigon opined that Taylor was "capable of performing some gainful employment with reasonable restrictions." (AR 11.) He noted that Rosenfeld did not disagree that Taylor was capable of work with restrictions; he opined that the restrictions placed by both Duda and Rosenfeld permitted sedentary to light work under the Dictionary of Occupational Titles, and the occupations identified by Weinberg were all sedentary occupations. Accordingly, he concluded that Taylor did not meet the definition of total disability. (Def. SUF ¶ 74; AR 11-12.) By letter dated May 13, 2008, the Taylor's second level appeal was denied. (Def. SUF ¶ 76.)

## III.   DISCUSSION

A claim challenging the denial of benefits under ERISA "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When the administrator or fiduciary has that authority, we apply an abuse-of-discretion or arbitrary and capricious standard. *Id.*; *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) and *Doroshow v. Hartford Life & Accident Ins. Co.*, 574 F.3d 230, 233 (3d

Cir. 2009). Under the arbitrary and capricious standard, we may overturn an eligibility decision if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (abrogated on other grounds). The burden of demonstrating that the abuse-of-discretion standard applies lies with the plan administrator. *Viera*, 642 F.3d at 413.

Because the Plan provides that JJPC may exercise discretion in making determinations of fact and interpreting the terms of the Plan, we find the arbitrary and capricious standard applies. Taylor's contention that he is entitled to *de novo* review because Defendant "operated under a conflict of interest," (*see* Pl. Br. at unnumbered pages 3, 6 (citing *Met. Life Ins. Co.*), is incorrect. In *Met. Life Ins. Co.*, the United States Supreme Court did not change the standard by which courts review benefit decisions where an allegedly conflicted fiduciary is granted discretion. Rather, it reiterated that where "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'" *Id.* at 111 (quoting *Firestone Tire & Rubber Co.* at 115.) The Court went on to state,

> "We do not believe that *Firestone's* statement implies a change in the standard of review, say, from deferential to *de novo* review. Trust law continues to apply a deferential standard of review to the discretionary decisionmaking of a conflicted trustee, while at the same time requiring the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion. *See* Restatement § 187, Comments d- j; *id.*, § 107, Comment f; Scott § 18.2, at 1342–1344. We see no reason to forsake *Firestone's* reliance upon trust law in this respect.

*Id.* at 115-16. The Court held only that *Firestone's* use of the word "'factor' implies . . . that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one." *Id.* at 117. Accordingly, it is

clear that the arbitrary and capricious standard applies, with J&J's alleged conflict a factor that we consider in determining whether its decision was arbitrary.

We find that the decision to terminate Taylor's entitlement to LTD benefits was not arbitrary and was supported by substantial evidence. The decision that Taylor's knee condition no longer qualified him for benefits was supported by the opinion of Dr. Duda, who found that Taylor could frequently stand, sit without limitation, and climb on an occasional basis and Dr. Frigon who opined that Taylor was "capable of performing some gainful employment with reasonable restrictions." The decision on Taylor's knee condition was also supported by the opinion of Shawn Vogel, who reported that Taylor satisfied the ability to perform all tasks required of a sedentary occupation, as defined by the United States Department of Labor Physical Demand Level for sedentary work, with restrictions on floor to waist lifting, crouching and kneeling, and by Steven Weinberg who opined that, based upon Taylor's medical status, education and prior work history, he was capable of performing a variety of sedentary occupations.

Notably, while Taylor's treating orthopedist, Dr. Rosenfeld, disputed the level of activity found by Dr. Duda, Dr. Rosenfeld agreed that Taylor could perform sedentary work when he found that he could stand on an occasional basis, sit on a frequent basis with the ability to get up and change positions on an as needed basis, climb steps occasionally, but never climb ladders. While Rosenfeld had earlier opined that Taylor could "never" return to work, his May 23, 2007 report stated only that he could not return to his previous occupation at the medium exertional level, or one that required significant amounts of standing, walking, climbing, bending or heavy lifting. This opinion is consistent with Rosenfeld's treatment notes from March 2007 that record Taylor's "excellent progress" with his right knee with no pain, only "intermittent discomfort" in

10

the left knee, and stated his belief that one more month of physical therapy "should do the trick for him." At the same time period, Taylor's physical therapist reported that he had less pain and greater mobility and that there was objective improvement in his condition.

Taylor's arguments attempting to show that J&J's benefits decision was arbitrary and capricious have no merit. He asserts that:

> J&J chose to only review medical records pertaining to the physical issues with Mr. Taylor at the final appeal stage, and totally ignored the volumes of records pertaining to his Psychiatric disabilities suffered by Mr. Taylor. J&J arbitrarily chose to take this view, even though Mr. Taylor had his benefits reinstated, after an initial appeal by counsel, as of February 22, 2006.

(Pl. Br. at unnumbered page 2.) Taylor's assertion that J&J ignored his mental health condition in terminating his benefits misses the mark. On April 11, 2007, Taylor was notified that his entitlement to LTD benefits based on his bilateral knee conduction would terminate on May 11, 2007. In that same notice, he was informed that his entitlement to benefits by reason of his mental health condition would continue, but that he must submit documentation that he was still being treated for this condition. (AR 192.) Thereafter, he was notified that both his entitlement to LTD benefits by reason of his mental health condition and by reason of his physical condition were terminated as of May 11, 2007. (AR 197-99.) While Taylor appealed the termination of his entitlement to LTD benefits based on his bilateral knee conduction, there is no indication in the record that he ever appealed the termination of his entitlement to benefits based on his mental health condition, or for that matter, that he still qualified for benefits based on his mental health condition by reason of his continued treatment for that condition. Accordingly, J&J's decision "to only review medical records pertaining to the physical issues" was not arbitrary.[4]

---

[4] For this same reason, Taylor's argument that J&J's decision is arbitrary because it failed to consider that he is currently receiving Social Security Disability Benefits ("SSDB") based on his mental health condition is inapposite. We note too that Taylor does not establish that the

11

For these reasons, this Court grants Defendant's Motion for Summary Judgment and denies Plaintiff's Cross-Motion for Summary Judgment. An appropriate order follows.

---

standards under which the SSDB determination was made was the same as that required by the Plan, or explain how the fact that he qualified for SSDB in 2002 controls the decision of whether he continued to qualify for LTD benefits under the Plan in 2008. Taylor's argument challenging Dr. Kossmann's report that he could work despite the threat he posed to coworkers, is also inapposite since it too concerns only Taylor's mental health condition. Finally, because this Court concludes that the decision to terminate benefits was not arbitrary, this Court need not reach J&J's other arguments that Taylor has sued the wrong party and that his claim under ERISA section 510 fails as a matter of law.